**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CRAIG S. LECADRE, | : | Civil No. 1:21-CV-00997 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| PENNSYLVANIA OFFICE OF THE | : | |
| ATTORNEY GENERAL, *et al.*, | : | |
| | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

Pending before the court is the motion for summary judgment filed by

Defendants Pennsylvania Office of the Attorney General ("OAG"), Kristen Heine

("Heine"), Rebecca Franz ("Franz"), Robert Drawbaugh ("Drawbaugh"), Eric

Norman ("Norman") and Shari McGraw ("McGraw") (collectively, "Defendants").

(Doc. 53.)  In his complaint, Plaintiff Crag S. LeCadre ("LeCadre") alleged Title

VII race discrimination based on disparate treatment and retaliation, a violation of

42 U.S.C. § 1981, retaliation for First Amendment speech under 42 U.S.C. § 1983,

and civil conspiracy under 42 U.S.C. § 1985 regarding the individual defendants.

(Doc. 1.)  In their motion for summary judgment, Defendants argue that there are

no genuine issues of material fact, and they are entitled to summary judgment as a

matter of law on all counts of the complaint because LeCadre has not provided

sufficient evidence to support his claims.  For the reasons that follow, the court

will grant Defendants' motion.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

LeCadre was hired as a Special Agent II in the OAG's insurance fraud section in 2001.  (Doc. 54, ¶ 2(a); Doc. 63-1, ¶ 2(a).)  In 2008, LeCadre was assigned to the Education and Outreach Unit in the Bureau of Investigative Services and reclassified to a Special Agent IV with the designation of Senior Supervisory Special Agent.  (Doc. 64-1, p. 8.)[1]  LeCadre was transferred to the Office of Professional Responsibility in 2013.  (Doc. 63, p. 6; Doc. 64-1, p. 7.)

On August 3, 2015, LeCadre was reclassified as a Special Agent II and reassigned to the Bureau of Criminal Investigations, Criminal Law Division.  (Doc. 64-3, p. 1.)  Defendant Robert Drawbaugh was LeCadre's supervisor from 2015 through the end of 2018.  (Doc. 54, ¶ 3(d); Doc. 63-1, ¶ 3.)  Defendant Eric Norman was LeCadre's supervisor beginning in January 2019.  (Doc. 54, ¶ 3(e); Doc. 63-1, ¶ 3.)

Sometime in 2019, LeCadre was assigned to an investigation related to possible insurance fraud and false documents.  (Doc. 54, ¶ 47.)  In the context of this investigation, a May 2019 email conversation occurred between LeCadre and his supervisor, Defendant Norman.  At 3:21 p.m. on May 30, 2019, LeCadre requested background checks for certain individuals involved in the insurance

---

[1] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

fraud investigation.  (Doc. 54, ¶ 49(a); Doc. 63-1, ¶ 49(a).)  Norman replied, asking

for a status update on an outstanding report about a victim interview in the case

and the reasons for the background checks, as Norman thought that they had

agreed that the outstanding victim interview report would be the next step in the

investigation.  (Doc. 54, ¶ 49(b); Doc. 63-1, ¶ 49(b).)  LeCadre responded

providing a bullet-point list of reasons for the background checks, and in the last

bullet point stated:

> It should be noted that in long-term investigations of this nature that
> witnesses/victims divulge information over a prolonged period of time
> because mostly we don't have enough data to ask the pertinent
> questions at that point in time.  I have successfully investigated multi-
> faceted organized criminal entities for (31) years and NEVER have
> been told not [to] run criminal history or other database checks on
> potential coconspirators let alone told to drop cases with REAL victims.

(Doc. 54-7, p. 3.)  LeCadre then requested a meeting "prior to case review so that

we appear to know what were [sic] doing."  (*Id.*)  Additionally, LeCadre forwarded

the email chain to Chief Deputy Attorney General of the Criminal Prosecution

Section, Defendant Kirsten Heine.  (*Id.*)

Norman responded that they were clearly on different pages because he was

led to believe that the case was wrapping up, and it would be best to meet to

discuss the case.  (Doc. 54, ¶ 49(d); Doc. 63-1, ¶49(d).)  LeCadre replied,

providing additional reasons for requesting the background checks.  (Doc. 54,

¶ 49(e), Doc. 63-1, ¶ 49(e).)  Norman responded by affirming the need to discuss the case in person.  (Doc. 54, ¶ 49(f); Doc. 63-1, ¶ 49(f).)

On May 31, 2019, the day after the email exchange, LeCadre and Norman had a confrontation regarding this case, as memorialized by Norman in a June 13, 2019 memorandum.  (Doc. 54-9; Doc. 63-1, ¶ 52.)  Norman recounts that upon LeCadre entering his office, LeCadre "almost immediately became upset[,]" and asked if Norman was accusing LeCadre of lying when Norman stated he had been misled.  (Doc. 54-9.)  Norman explained that he thought the outstanding victim report was the next step in the case in order to determine if there was enough evidence to substantiate criminal charges.  (*Id.*)  LeCadre told Norman he would not finish the report, that he was going to interview the victim again, and that he is an experienced investigator who knows what he is doing.  (*Id.*)  Norman told LeCadre he was being too defensive, to which LeCadre responded to not use adjectives to describe him.  (*Id.*)  Norman further recalled that after five to ten minutes, LeCadre "calmed down," and they had a productive discussion about the case.  LeCadre emailed the outstanding report on June 4, 2019.  (*Id.*)

On June 2, 2019, Defendant Kirsten Heine forwarded the email exchange to Defendant Shari McGraw, Director of Human Resources at the OAG in order for Heine, McGraw, and Norman to discuss the incident. (Doc. 54, ¶ 53; Doc. 54-7, p. 1; Doc. 63-1, ¶ 53.)  In her email to McGraw, Heine stated that "the tone of the

emails seems completely out of line." (Doc. 54-7, p. 1.)  Heine stated "I plan talk

to Eric [Norman] about whether [LeCadre] should be disciplined in any way.  I am

not inclined to let things slide when he is a persistent problem." (*Id.*)

At some point between June and September 2019, a decision was made to

refer LeCadre for a fitness for duty evaluation.  So, on September 4, 2019,

McGraw sent a letter to Dr. Louis Laguna, who had agreed to conduct the fitness

for duty evaluation.  (Doc. 54, ¶ 54; Doc. 54-10; Doc. 63-1, ¶ 54.)  On September

11, 2019, LeCadre received a letter stating that he was being placed on paid

administrative leave beginning that day and that he needed to attend the fitness for

duty evaluation scheduled for the next day, September 12, 2019.  (Doc. 54, ¶ 55;

Doc. 54-11; Doc. 63-1; ¶ 55.)  The letter further stated, "[p]lease note that neither

the evaluation nor the Administrative Leave status impact your classification as a

Special Agent II or your salary, and they do not constitute employee discipline."

(Doc. 54-11.)

LeCadre attended and completed the evaluation.  (Doc. 54, ¶ 56; Doc. 63-1,

¶ 56.)  Dr. Laguna submitted his evaluation on September 19, 2019, finding

LeCadre fit for duty.  (Doc. 54, ¶ 57; Doc. 54-12, p. 6; Doc. 63-1, ¶ 57.)  LeCadre

was notified on October 7, 2019, that he was allowed to return to work on October

9, 2019.  (Doc. 54, ¶ 58; Doc. 63-1, ¶ 58.)  That same day, LeCadre provided a

letter to McGraw from his doctor and requested that he be placed on sick leave,

starting October 9, 2019.  (Doc. 54, ¶ 60; Doc. 63-1, ¶ 60.)  LeCadre was placed on FMLA leave until he returned to work on January 20, 2020.  (Doc. 54, ¶ 61; Doc. 63-1, ¶ 61.)

On December 26, 2019, Lecadre filed a charge of discrimination ("first charge") with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRA").  (Doc. 54, ¶ 62; Doc. 54-17; Doc. 63-1, ¶ 62.)  In the charge, LeCadre alleged that he was discriminated against because of his race for the following reasons: he was demoted to Special Agent II in 2015; the 2019 administrative leave was "done without explanation or justification;" a similarly situated white female agent who expressed "issues" was offered counseling and he was not; "OAG's management was hostile towards me because of my high-profile cases involving a close associate of the current AG…[;]" and Norman and Norman's direct superior, Doug Hilyard "continued the harassment."  (Doc. 54-17, pp. 1–2.)  The OAG filed a written position letter with the EEOC on February 24, 2020, refuting the allegations.  (Doc. 54, ¶ 63; Doc. 54-18; Doc. 63-1, ¶ 63.)

At some point after he returned to work in January 2020, LeCadre was assigned "scanning" work.  (Doc. 63-1, ¶ 75; Doc. 54-3, p. 157; Doc. 64-6, pp. 66–67.)  LeCadre characterizes this work as "secretarial."  (Doc. 63, p. 12.)  In his deposition, Norman characterized the "scanning project" as "casework" for a

"mammoth case" which included a "large amount of scanning that needed to be done." (Doc. 64-6, p. 66.)

On June 22, 2020, LeCadre received his performance evaluation for the period of August 1, 2018, through August 1, 2019. (Doc. 54, ¶ 64; Doc. 63-1, ¶ 64.)[2] LeCadre received an overall "satisfactory" rating. (Doc. 54-21, p. 3.)

On October 6, 2020, LeCadre filed an amended charge of discrimination with the EEOC ("amended charge"). (Doc. 54, ¶ 67; Doc. 54-19; Doc. 63, ¶ 67.) The amended charge, which contains the same factual allegations as the first charge, additionally alleged that the discrimination at issue is a "continuing action" and added that he was provided a "false and misleading" performance evaluation on June 22, 2020. (Doc. 54-19, p. 2.) LeCadre also added that "Respondent [OAG] disciplined me on August 03, 2015, on a continuing basis through

---

[2] The court notes there are discrepancies between the report provided to LeCadre, Doc. 54-21, and the report attached to the OAG's position letter in response to the amended EEOC charge ("EEOC eval"), Doc. 54-20, pp. 8–14. The court notes the following discrepancies: Doc. 54-21 states a rating period of 08/01/2018 through 08/01/2018 while the EEOC eval states a rating period of 08/01/2018 to 08/01/2019. Doc. 54-21 does not contain a page titled "I. Job Factors" and the evaluations and comments for subsections "job knowledge/skills," "professional development," and "work results." This page is present in the EEOC eval, and LeCadre received "satisfactory" ratings in all of these categories. (Doc. 54-20, p. 9.) Doc. 54-21 is signed by Norman on 6/22/2020 and signed by a reviewer on 6/22/2020 on p. 5, but the EEOC eval is not signed or dated by an evaluator or reviewer. (Doc. 54-20, p. 12.) Doc. 54-21 has "Refuse to Sign" circled in the employee signature space, Doc. 54-21, p. 6, but the EEOC eval is not signed and acknowledged by an employee, Doc. 54-20, p. 13. Finally, the "SA LeCadre Evaluation Supplemental" page is initialed "EN 6/22/2020" in Doc. 54-21, but is not initialed in the EEOC eval. (Doc. 54-20, p. 14.) All other substantive parts of the documents are identical. The court finds that these are different copies of the same document and will consider them together as a whole.

September 11, 2019, and then suspended me from September 12, 2019, to October 9, 2019." (*Id.*)  The OAG filed a written position letter to the amended charge on November 10, 2020.  (Doc. 54-20.)  The EEOC issued a right to sue letter on April 7, 2021.  (Doc. 54, ¶ 69; Doc. 63-1, ¶ 69.)  LeCadre voluntarily retired from OAG in October 2022.  (Doc. 54, ¶ 2(c); Doc. 63-1, ¶ 2(c).)[3]

LeCadre initiated this action by filing a complaint on June 3, 2021.  (Doc. 1.)  The complaint originally named, in addition to the Defendants previously identified, then-Attorney General Josh Shapiro ("Shapiro"),[4] Bruce Beemer,[5] and John/Jane Does.  The complaint contains the following four counts: Count I – Title

---

[3] The court notes that LeCadre also included other factual allegations in his complaint and brief in opposition including: an interaction with Defendant Franz where she told LeCadre he would not be testifying at a preliminary hearing; a description of the "Porngate" scandal and how it made LeCadre upset when people involved in that scandal were promoted and he was not; an incident in 2017 where he was cropped out of a photo from a press conference; a 2017 investigation where he was the only black agent present and assigned to guard the van alone for at least twenty hours with no breaks; an interaction in January 2019 with Senior Deputy Attorney General Anthony Forray where Attorney Forray was not satisfied with LeCadre's work on a criminal complaint, snatched the complaint from LeCadre's hands, and ripped it up; a meeting in January 2019 with Drawbaugh, Norman, Heine, Forray, and LeCadre where Heine said "I know what this guy's game is.  I am not going to listen to this" when LeCadre was describing Forray's actions; an interaction with Chief Deputy Attorney General James Barker where, after heated conversation, Barker said LeCadre "should go back to scanning documents like a good little boy[;]" and a training at Fort Indiantown Gap where another agent was wearing a belt buckle with a confederate flag on it.  (Doc. 63, pp. 6–13.)  The court is not considering these facts in the analysis below because LeCadre has failed to show the relevance of these facts to his claims in this action.

[4] At the time of filing of the complaint, Josh Shapiro was the Attorney General of Pennsylvania.  Josh Shapiro is now the Governor of Pennsylvania.  For the purposes of clarity, the court will refer to now Governor Shapiro as "Shapiro."

[5] The court approved the parties' stipulations to dismiss Defendant Bruce Beemer on August 6, 2021.  (Doc. 9.)

VII violation based on disparate treatment and retaliation;[6] Count II – 42 U.S.C.

§ 1981 violation; Count III – 42 U.S.C. § 1983 violation for retaliation for First

Amendment speech; and Count IV – 42 U.S.C. § 1985 violation for civil

conspiracy only as to the individual Defendants. (*Id.*)

Defendants Drawbaugh, Franz, Heine, McGraw, Norman, and OAG

answered the complaint on September 2, 2021. (Doc. 15.) Shapiro filed a motion

to dismiss for failure to state a claim on September 2, 2021, and his brief in support

on September 15, 2021. (Docs. 16, 17.) Shapiro moved to dismiss the complaint

against him because there is no personal liability under Title VII, LeCadre failed to

allege any personal involvement by Shapiro as to the § 1983 claim, there is no

viable claim against state actors under § 1981, and LeCadre failed to allege any

facts that Shapiro formed an agreement or performed an overt act in the § 1985

conspiracy claim. (Doc. 17.)

On September 26, 2022, after full briefing, the court granted Shapiro's

motion to dismiss and dismissed Counts I, II, and III with prejudice as to Shapiro.

(Doc. 42.) The court also dismissed Count I with prejudice as to Heine, Franz,

Drawbaugh, Norman, and McGraw because, under Third Circuit precedent, a Title

---

[6] Although LeCadre pleaded his Title VII claims as one count, he alleged two distinct causes of action under Title VII, disparate treatment and retaliation. A disparate treatment claim is governed by 42 U.S.C. § 2000e-2. A retaliation claim is governed by 42 U.S.C. § 2000e-3. Accordingly, the court will address these two claims separately.

VII claim cannot be brought against defendants in their individual or official capacities. (Doc. 41, p. 8; Doc. 42.) The court also dismissed Count IV without prejudice as to Shapiro and allowed LeCadre to file an amended complaint. (Doc. 42.) LeCadre elected not to file an amended complaint. As a result, Shapiro is no longer a defendant in this action.

On December 30, 2022, OAG, Heine, Franz, Drawbaugh, Norman, and McGaw moved for summary judgment, arguing that LeCadre failed to exhaust his administrative remedies regarding his EEOC complaint, failed to establish a *prima facie* case of a Title VII disparate treatment or retaliation claim, did not engage in speech protected by the First Amendment, and failed to support his evidentiary burden for the §§ 1981 and 1985 counts. (Doc. 58, p. 5.) Defendants filed their brief in support on January 9, 2023. (Doc. 58.) LeCadre filed his brief in opposition on February 3, 2023. (Doc. 64.) Defendants filed a reply brief on February 17, 2023. (Doc. 67.) LeCadre, with leave of court, filed a surreply on March 6, 2023. (Doc. 70.) Accordingly, the motion for summary judgment is now ripe for review.

## JURISDICTION AND VENUE

The court has federal question jurisdiction because LeCadre asserts claims under federal law. *See* 28 U.S.C. § 1331. Venue is appropriate because all actions or inactions occurred within the Middle District of Pennsylvania.

## STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is material if resolution of the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not precluded by "[f]actual disputes that are irrelevant or unnecessary." *Id.* "A dispute is genuine if a reasonable trier-of-fact could find in favor of the nonmovant' and 'material if it could affect the outcome of the case." *Thomas v. Tice*, 943 F.3d 145, 149 (3d Cir. 2019) (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)). The court may not "weigh the evidence" or "determine the truth of the matter." *Anderson*, 477 U.S. at 249. Instead, the court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial." *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or denials of [its] pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice.'" *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Summary judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

DISCUSSION

Defendants move for summary judgment because: LeCadre has not administratively exhausted his claims; has failed to produce sufficient evidence to support a *prima facie* Title VII disparate treatment race discrimination or retaliation claim; has failed to produce sufficient evidence to support a claim of First Amendment retaliation under 42 U.S.C. § 1983; has failed to produce sufficient evidence of a violation of 42 U.S.C § 1981; and has failed to produce sufficient evidence of a civil conspiracy under 42 U.S.C. § 1985.  (Doc. 58.)  The court will address each argument in turn.

## A. Judgment will be granted in favor of Defendants on the Title VII disparate treatment and retaliation claims.

Defendants argue judgment should be entered in their favor on the alleged Title VII violations because LeCadre has not properly administratively exhausted all of his claims of discrimination with the EEOC given that many of them are outside of the scope of his December 2019 charge, and he cannot produce sufficient evidence to support any element of a *prima facie* case of race discrimination under Title VII.  (Doc. 58, p. 7.)  LeCadre argues that he properly exhausted his claims because he timely filed his EEOC charges and the continuing violation doctrine applies to any claims outside of the time constraints inherent in Title VII, and he can produce sufficient evidence of a *prima facie* race discrimination claim under Title VII.  (Doc. 63, p. 14.)

13

1. **LeCadre properly exhausted administrative remedies regarding the September 2019 paid leave and June 2020 performance evaluation.**

Before filing suit in federal court, a plaintiff alleging employment discrimination must exhaust administrative remedies. *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 163 (3d Cir. 2013). Thus, a plaintiff must bring a timely charge of discrimination before the EEOC and obtain notice of his right to sue in order to exhaust his administrative remedies. *Mandel*, 706 F.3d at 163. In order for a charge to be timely, a plaintiff alleging discrimination under Title VII in Pennsylvania must bring an EEOC charge within 300 days after the alleged unlawful employment practice. *See* 42 U.S.C. § 2000e-5(e)(1); *Mikula v. Allegheny Cnty. of Pa.*, 583 F.3d 181, 183 (3d Cir. 2009); *Watson v. Eastman Kodak Co.*, 235 F.3d 851, 854 (3d Cir. 2000).

Defendants argue that any action alleged by LeCadre which occurred before March 1, 2019[7] is untimely and cannot be the basis of a discrimination claim. (Doc. 58, p. 9.) LeCadre argues that the continuing violation doctrine applies to his claims because his EEOC charges allege a pattern of discriminatory behavior and, because one of those discriminatory acts is timely, the whole pattern of discriminatory behavior stretching back multiple years should be analyzed.

---

[7] This is 300 days before LeCadre filed his first EEOC charge on December 26, 2019.

14

The continuing violation doctrine serves as an equitable exception to the time bar under Title VII, allowing courts to consider "discriminatory acts that are not individually actionable . . . so long as they are linked in a pattern of actions which continues into the applicable limitations period." *Mandel*, 706 F.3d at 165 (citing *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006)). Thus, a "plaintiff may pursue a Title VII claim for discriminatory conduct that began prior to the filing period if he can demonstrate that the act is part of an ongoing practice or pattern of discrimination of the defendant." *West v. Phila. Elec. Co.*, 45 F.3d 744, 754 (3d Cir. 1995). A plaintiff must prove that at least one discriminatory act occurred within the limitations period and that this alleged wrong "is more than the occurrence of isolated or sporadic acts." *Kimes v. Univ. of Scranton*, 126 F. Supp. 3d 477, 492 (M.D. Pa. 2015). Because the continuing violation doctrine requires plaintiffs to prove a pattern of discriminatory conduct, the continuing violation doctrine is only "available to toll the statutory timely filing requirement for hostile work environment claims." *Brooks v. Randstad Techs., LLC*, No. 19-CV-4037, 2022 WL 874946, at * 4 (E.D. Pa. March 24, 2022) (citing *Mandel*, 706 F.3d at 165 ("Under the continuing violation doctrine, discriminatory acts that are not individually actionable may be aggregated to make out a hostile work environment claim.")).

LeCadre raises disparate treatment and retaliation claims, not a hostile work environment claim. Therefore, the continuing violations doctrine does not apply to his claims. Accordingly, in order for discriminatory conduct to be properly exhausted and provide the basis for the Title VII claims, it must have occurred after March 1, 2019. LeCadre's first charge includes being demoted in 2015. (Doc. 54-17.) This conduct has not properly been exhausted and is not actionable.[8] The rest of the charge alleges "discipline" occurring on September 11, 2019 and being "suspended" from September 12, 2019 to October 9, 2019. (*Id.*) These incidents are properly exhausted and will be considered by the court.

LeCadre's amended charge includes the same unexhausted 2015 demotion and the properly exhausted September 2019 "suspension." (Doc. 54-19.) The amended charge also alleges "[r]espondent [OAG] disciplined me on August 03, 2015, on a continuing basis through September 11, 2019, and then suspended me from September 12, 2019, to October 9, 2019." (*Id.*) As explained above, any conduct that is part of an allegedly continuing pattern of discrimination that occurred prior to March 1, 2019, 300 days before the filing of the charge, is time-

---

[8] Moreover, even if the continuing violation doctrine did apply to his claims, discrete acts, such as "termination, failure to promote, denial of transfer, or refusal to hire" cannot be the basis for a plaintiff to invoke the continuing violation doctrine, because each discrete act "constitutes a separate actionable 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002). For this additional reason, the discrete act of LeCadre's 2015 demotion was not properly administratively exhausted and is no longer actionable.

barred for purposes of the disparate treatment and retaliation claims and will not be considered by the court.

The amended charge also alleges that Norman retaliated against LeCadre for filling the first charge by providing a false and misleading performance evaluation on June 22, 2020.  (*Id.*)  Defendants argue that the retaliation allegation contained in the amended charge is not within the scope of the first charge because it involves different actors, times, and reasons than the alleged discrimination in the first charge.  (Doc. 54, p. 10.)  LeCadre argues that his retaliation claim is properly exhausted because he filed an amended EEOC charge 122 days after receiving the performance evaluation, received a right to sue letter on April 7, 2021 for the charges, and filed the complaint with 90 days of receiving the right to sue letter. (Doc. 63, p. 17.)

The court agrees with LeCadre that the retaliation claim was properly exhausted through the amended EEOC charge because the amended charge was filed within 300 days of the allegedly discriminatory conduct.  Defendants rely upon *Simko v. U.S. Steel Corp.*, 992 F.3d 198 (3d Cir. 2021), for their argument that the retaliation claim must be within the scope of the first EEOC charge.  *Simko* addressed a situation where a plaintiff attempts to allege conduct in their complaint in federal court that was not included in their EEOC charge.  Because we find that the retaliation claim was properly exhausted in the amended EEOC charge, we do

not need to apply the analysis from *Simko* to determine if the retaliation allegation was properly within the scope of the first EEOC charge.[9]

In conclusion, because the continuing violation doctrine does not apply, any allegedly discriminatory conduct which took place before March 1, 2019, is not properly before the court as a basis for LeCadre's disparate treatment claim. The court also concludes that LeCadre has properly exhausted his retaliation claim based on the June 2020 performance review. The court will now turn to the merits of LeCadre's Title VII claims.

### 2. LeCadre has not provided evidence showing that he suffered an adverse employment action.

Title VII makes it an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against

---

[9] 29 CRF §1601.12 provides that

> A charge may be amended to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations therein. Such amendments and amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received.

The retaliation claim in the amended charge is sufficiently similar to first charge because Norman is a main actor in both, and because the retaliation was allegedly for the action of filing the first charge. Further, a central purpose of the administrative exhaustion requirement is "to enable the EEOC to investigate, and if cause is found, to attempt to use informal means to reach a settlement of the dispute." *Anjelino v. N.Y. Times Co.*, 200 F.3d 73, 94 (3d Cir. 1999). An additional aim is "'giv[ing] prompt notice to the employer' and 'encourag[ing] the prompt processing of all charges of employment discrimination.'" *Simko*, 992 F.2d at 207. Here, LeCadre received a right to sue letter, signaling the end of EEOC's investigation, and OAG sent responses to both charges, Docs. 54-18, 54-20, showing that OAG had sufficient notice that LeCadre was raising these claims. Accordingly, we will address the retaliation claim contained in the amended charge.

any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Because LeCadre has not provided direct evidence of discrimination, we must analyze his claim under the *McDonnell Douglas* burden shifting framework.  *Burton v. Teleflex Inc.*, 707 F.3d 417, 425–26 (3d Cir. 2013) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973)).

### i.  Disparate Treatment Claim

In order for a plaintiff to prove a disparate treatment claim in violation of Title VII, the plaintiff must show: "(1) s/he is a member of a protected class; (2) s/he was qualified for the position s/he sought to attain or retain; (3) s/he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination."  *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008) (citing *McDonnell Douglas*, 411 U.S. at 802).  There is no dispute that LeCadre is a member of a protected class and that he was qualified for his position as Special Agent II.  (Doc. 58, p. 14; Doc. 63, p. 21.) Accordingly, the court will begin its analysis of the disparate treatment claim with whether LeCadre suffered an adverse employment action.

Defendants argue that being placed on paid administrative leave pending the outcome of a fitness for duty examination is not an adverse employment action

because there was no effect on LeCadre's compensation.  (Doc. 58, pp. 15–6.)
LeCadre argues that being placed on paid administrative leave for twenty-eight
days and then being assigned a scanning project when he returned would "dissuade
a reasonable employee from making a Charge of discrimination because Plaintiff
was seemingly suspended for an indefinite period until Defendants got around to
reviewing Dr. Laguna's report."  (Doc. 63, p. 21.)

An adverse employment action under 42 U.S.C. § 20000e-2(a) is an action
by an employer that is "serious and tangible enough to alter an employee's
compensation, terms, conditions, or privileges of employment."  *Storey v. Burns
Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004).  Section 2000e-2(a) specifically
provides that it shall be unlawful to "fail or refuse to hire or to discharge" or "to
limit, segregate, or classify [an] employee[]. . . in any way which would deprive or
tend to deprive any individual of employment opportunities or otherwise adversely
affect his status as an employee . . ." based on the employee's race.  42 U.S.C. §
2000e-2(a).  Additionally, "a transfer to a less desirable position or an
unsatisfactory job evaluation may constitute the requisite adverse employment
action as to the terms, conditions, and privileges of employment, but modest
changes in duties or working conditions and actions that simply make an employee
unhappy but not producing a material disadvantage do not."  *U.S. Equal Emp.
Opportunity Comm'n v. Bob Evans Farms, LLC*, 275 F. Supp. 3d 635, 659 (W.D.

Pa. 2017). "Employment actions such as lateral transfers and changes of title or reporting relationships have generally been held not to constitute adverse employment actions."  *Walker v. Centocor Ortho Biotech, Inc.*, 558 F. App'x 216, 219 (3d Cir. 2014).

LeCadre's placement on paid administrative leave is not an adverse employment action because it did not affect LeCadre's compensation or rights and privileges of employment.  The change in LeCadre's job duties after returning to work from the paid administrative leave also was not an adverse employment action because LeCadre does not provide any evidence that the scanning assignment produced a "material disadvantage."  Despite LeCadre's characterization of the scanning assignment as "secretarial" work, there is no evidence showing that his job title or description changed in a way that affected his compensation or benefits.  While a change in job duties may constitute an adverse action when it materially effects a plaintiff's employment or hinders future employment prospects, there is no evidence that the instruction for LeCadre to complete a scanning assignment for a case did so.

LeCadre does not dispute these points.  Instead, LeCadre relies on the standard of adverse employment action that applies to retaliation claims under 42 U.S.C. § 2000e-3 in order to support his argument that the scanning job is an adverse employment action for the purpose of his disparate treatment claim.  This

argument is unavailing because the different standards that apply to the two causes of action are due to the differing goals of the two sections of the statute. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006).  The antidiscrimination provision of the Title VII statute, § 2000e-2, "seeks a workplace where individuals are not discriminated against because of their racial, ethnic, religious, or gender-based status." *Id.*  In contrast, the "antiretaliation provision [§ 2000e-3] seeks to secure [the objective of the antidiscrimination provision] by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." *Id.* Therefore, because retaliation for filing an EEOC claim is broader in scope than discriminatory workplace action, there is a broader standard for when an action is an "adverse employment action" in the context of a retaliation claim. *Id.* at 64.

Accordingly, LeCadre's argument that his assignment to scanning duties would dissuade a reasonable employee from making a charge of discrimination is not relevant to the determination of whether there was an adverse employment action in the disparate treatment claim.  As explained above, under the standard properly applied in a disparate treatment context, the paid administrative leave and Plaintiff being assigned scanning duties after returning from paid administrative leave are not adverse employment actions because they did not affect the compensation, benefits, or privileges of LeCadre's employment.

22

Because the court finds that LeCadre has not provided evidence showing an adverse employment action, he cannot prove a *prima facie* case of racial discrimination based on disparate treatment under Title VII.

### ii. Retaliation Claim

To state a claim for retaliation under Title VII, a plaintiff must allege that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Phila.*, 461 F.3d 331, 340–41 (3d Cir. 2006) (citing *Nelson v. Upsala Coll.,* 51 F.3d 383, 386 (3d Cir.1995)).  There is no dispute that LeCadre engaged in an activity protected by Title VII when he filed his first charge. *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997); 42 U.S.C. § 2000e-3(a).  Therefore, the court will turn to whether he suffered an adverse employment action.

Defendants argue that LeCadre's "satisfactory" 2019 performance review was not an adverse employment action because it had no adverse impact on his employment with OAG.  (Doc. 58, p. 19.)  LeCadre argues that the performance evaluation rendered him unable to find other employment because it was contained in his file which was sent to prospective employers.

In a retaliation claim, "an adverse employment action is one that 'might well have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Walker*, 558 F. App'x at 220 (quoting *Burlington N.*, 548 U.S. at 68). Unlike an adverse action in a disparate treatment claim, the adverse action in a retaliation claim "is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington N.*, 548 U.S. at 64. However, the adverse action must still be a "significant, rather than trivial harm." *Yeager v. UPMC Horizon*, 698 F. Supp. 2d 253, 544 (W.D. Pa. 2010). As such, "an employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington N.*, 548 U.S. at 68. This inquiry is "a fact intensive inquiry and [requires] an analysis of the totality of the circumstances." *Johnson v. Cmty. Coll. of Allegheny Cnty.*, 566 F. Supp. 23 405, 431–43 (W.D. Pa. 2008).

LeCadre's satisfactory employment review was not an adverse employment action that would dissuade a reasonable worker from filing a charge of discrimination. While, as LeCadre points out, his performance review for 2019 was "lower" than his prior performance reviews, Doc. 64-7, the 2019 performance review was drafted by a different supervisor than the prior reviews. It is reasonable to expect that a change in supervisor would result in a change in the

substance of a performance review.  Further, the court notes that the performance review was still "satisfactory" and not accompanied by any threat of discipline or other employment action which would serve to dissuade a reasonable employee from filing an EEOC charge.  Additionally, there was no discipline or placement on an improvement plan that accompanied the review.

LeCadre also argues that the performance evaluation impacted his future employment opportunities.  However, LeCadre provides no evidence to support this assertion.  He points to the portion of his deposition discussing this topic where he states:

> I filled out hundreds of applications since this whole mess started in 2019.  I lost count.  Jobs that I was lined up for, I interviewed for, I thought I was going to get, only to find out the job has been canceled because they probably went and Googled my name.  I just saw a notification for one of the federal positions I applied for get cancelled, and I was the top candidate.  They even sent my stuff on to the hiring manager.

(Doc. 54-3, p. 199.)

LeCadre argues that this statement shows there was "at least one instance where his application was canceled after the OAG sent his record to the hiring manager."  (Doc. 63, p. 29.)  To the contrary, this statement merely shows LeCadre's speculation as to why he was not hired for future positions and is insufficient to defeat a motion for summary judgment.  *Greene v. Virgin Islands Water & Power Auth.*, 557 F. App'x 189, 194 (3d Cir. 2014).  LeCadre provides no

further evidence that this performance review had any effect whatsoever on his employment with OAG or future employers.  And, LeCadre's speculative deposition testimony does not even indicate that he suspected that OAG sent his record to any prospective employer.  Therefore, the satisfactory performance review was not an adverse employment action, and LeCadre fails to prove a *prima facie* case of retaliation under Title VII.

Because LeCadre has failed to produce evidence supporting his claims of Title VII discrimination and retaliation, there is no genuine issue of material fact and Defendants are entitled to judgment as a matter of law on Count I.  Having reached this conclusion, the court will not address the remaining elements of these claims.

### B. Judgment will be granted in favor of Defendants on Count III for First Amendment retaliation in violation of 42 U.S.C. § 1983.

In his complaint, LeCadre alleged that he was retaliated against "when he advised Defendants that a specific public official purchased racist paraphernalia with public funds; and that potential conflicts of interest existed."  (Doc. 1, ¶ 105.)  Defendants argue that LeCadre was not speaking as a citizen at this time because LeCadre discovered the paraphernalia through his employment as an investigator.  (Doc. 58, p. 17.)  In his brief in opposition, LeCadre concedes that he was not speaking as a citizen in the incident in question.  (Doc. 63, p. 30.)

In order to prove a First Amendment retaliation claim, a plaintiff must provide evidence that 1) "the activity in question is protected by the First Amendment, and (2) that the protected activity was a substantial factor in the alleged retaliatory action." *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006). "A public employee's statement is protected activity when (1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he made." *Id.* at 241–42 (quoting *Garcetti v. Ceballos*, 547 US. 410 (2006)).

Because LeCadre concedes that he was not speaking as a citizen at the time of the alleged retaliation, he cannot prove his claim of First Amendment retaliation, and Defendants are entitled to judgment as a matter of law on Count III.

### C. Judgment will be granted in favor of Defendants on Count II for a violation of 42 U.S.C. § 1981.

Defendants argue that they are entitled to judgment as a matter of law because § 1981 does not provide a right or remedy against state actors. (Doc. 58, pp. 22–23.) LeCadre argues that the claim should not be dismissed because his § 1981 claim is viable by being brought in conjunction with a § 1983 claim. (Doc. 63, p. 30.)

The court agrees with Defendants.  Section 1981 does not create a private right of action, nor does it provide a remedy against a state actor.  *McGovern v. City of Phila.*, 554 F.3d 114, 116–17 (3d Cir. 2009); *see also Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989).  Because the § 1983 claim will not proceed, LeCadre cannot prevail on a § 1981 claim against OAG because it is a state actor.  LeCadre also cannot prevail on a § 1981 claim against the individually listed Defendants because, from the context of the complaint, all individually listed defendants are being sued in their official capacity as employees performing their employment duties in the OAG.  *See Poli v. SEPTA*, No. 97-6766, 1998 WL 405052, at *13 (E.D. Pa. July 7, 1998).  Accordingly, all remaining Defendants are entitled to summary judgment on Count II.

### D. Judgment will be entered in favor of Defendants on Count IV for violation of § 1985 because LeCadre has failed to establish a conspiracy.

Defendants argue LeCadre has failed to prove a civil conspiracy claim under § 1985 because he fails to provide evidence of a conspiracy or discriminatory intent.  (Doc. 67, p. 12.)  LeCadre argues that Defendants Norman, Heine, and McGraw conspired to "demean and retaliate" against him after he filed his EEOC charge.  (Doc. 63, pp. 31–32.)

42 U.S.C. § 1985(3) provides a right of action for one "injured by a conspiracy formed 'for the purpose of depriving either directly or indirectly, any

person or class of persons of the equal protections of the laws, or of the privileges

and immunities under the laws.'" *Farber v. City of Paterson*, 440 F.3d 131, 134

(3d Cir. 2006) (quoting 42 U.S.C. § 1985(3)).  The elements for a claim under

§ 1985(3) are:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or
> indirectly, any person or class of persons of the equal protection of the
> laws, or of equal privileges and immunities under the laws; and (3) an
> act in furtherance of the conspiracy; (4) whereby a person is injured in
> his person or property or deprived of any right or privilege of a citizen
> of the United States.

*United Brotherhood of Carpenters & Joiners v. Scott*, 463 U.S. 825, 828–29

(1983).

    "Because direct evidence of a conspiracy is rarely available, the existence of

a conspiracy may be inferred from the circumstances."  *Stoneroad v. Johnson*, No.

1:18-CV-02276, 2020 WL 2107665, at *14 (M.D. Pa. Apr. 6, 2020) (citing

*Capogrosso v. The Supreme Ct. of N.J.*, 588 F.3d 180, 184 (3d Cir. 2009)).  In

order to establish the existence of a conspiracy, LeCadre must point to specific

facts showing that Defendants "reached an understanding or agreement to violate

his civil rights."  *Taylor v. JFC Staffing Assocs.*, 90 F. Supp. 2d 357, 373–74 (M.D.

Pa. 2009).  There must be facts "demonstrating the existence and scope of the

conspiracy, including specific facts suggesting that there was a mutual

understanding among the conspirators to take action directed toward an

unconstitutional end." *Grigsby v. Kane*, 250 F. Supp. 2d 453, 458 (M.D. Pa. 2003).

The court notes that LeCadre has not alleged participation by Defendants Franz or Drawbaugh in any potential conspiracy. Therefore, summary judgment will be granted in their favor on this count. LeCadre does argue that Defendant Norman treated him differently than other agents after his return to work by assigning him the scanning job. (Doc. 63, p. 31.) This fact does not show an agreement between Norman and any other defendant. LeCadre further argues that Norman and McGraw "conspired to create a false and misleading performance evaluation . . . ." (*Id.* at 31–32.) However, the undisputed evidence shows that Norman was the only defendant who completed that action. Again, because Norman is the only person who filled out the performance evaluation, and there is no further proof of an agreement between Defendants to do anything, these facts do not support a claim of conspiracy.

Finally, LeCadre argues that Norman, Heine, and McGraw decided he was a "persistent problem" and used stereotypes such as "angry," "loud," and "paranoid" to describe him. (*Id.* at 32.) LeCadre points to the email conversation that Heine forwarded to McGraw wherein Heine referred to LeCadre as a "persistent problem," deposition testimony stating that Norman, Heine, and McGraw had conversations about how to address LeCadre's behavior in the office, and the

language in McGraw's referral letter to Dr. Laguna as support for his conclusion that these Defendants entered into a conspiracy. These facts do not show a meeting of the minds to conspire to violate LeCadre's rights, but rather, show that his superiors had conversations about his workplace behavior and how to address it. This is insufficient to support a claim under § 1985. *Taylor*, 690 F. Supp. 2d at 374. Accordingly, LeCadre has not established that there was a conspiracy against him, and Norman, Heine, and McGraw are entitled to judgment as a matter of law on Count IV.

### CONCLUSION

LeCadre has failed to show a genuine issue of material fact on an essential element of both of his Title VII claims. LeCadre has also failed to show a genuine issue of material fact on his §§ 1983, 1981, and 1985 claims. Accordingly, Defendants are entitled to summary judgment as a matter of law on all counts. An appropriate order will follow.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: September 29, 2023